# UNITED STATES *v.* TWIN CITY POWER CO. ET AL.

No. 21. Argued October 18, 1955.—Decided January 23, 1956.

*Ralph S. Spritzer* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Morton* and *Roger P. Marquis.*

*David W. Robinson* argued the cause for respondents. With him on the brief were *James F. Dreher* and *R. Hoke Robinson.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit for condemnation of land instituted by the United States against respondent power company. A single question of valuation is presented. It is whether the just compensation which the United States must pay by force of the Fifth Amendment includes the value of the land as a site for hydroelectric power operations. The Fourth Circuit Court of Appeals held that it does. 215 F. 2d 592. The Court of Appeals for the Fifth Circuit reached the same result in litigation involving other lands in the same hydroelectric project. *United States* v. *Twin. City Power Co.,* 221 F. 2d 299. We granted the petition for certiorari in the former case because of the importance of the issue presented. 348 U. S. 910.

The condemnation proceedings are part of the procedure for completion of the Clark Hill project on the Savannah River, a navigable stream in southeastern United States. The Clark Hill project is the first in a series of steps recommended by the Chief of Army Engineers for the improvement of the basin of that river. H. R. Doc. No. 657, 78th Cong., 2d Sess. That Report conceives of the Clark Hill project as serving multiple purposes—hydroelectric, flood control, and navigation. It states that the Clark Hill project, "if suitably constructed and operated primarily for hydroelectric-power development, would incidentally reduce downstream flood damages and improve low-water flows for navigation." *Id.,*

p. 3. Congress approved this project as part of "the comprehensive development of the Savannah River Basin for flood control and other purposes." Section 10 of the Flood Control Act of 1944, 58 Stat. 887. And see *United States ex rel. Chapman* v. *Federal Power Commission,* 345 U. S. 153, 170.

The Court of Appeals concluded that the improvement of navigation was not the purpose of the taking but that the Clark Hill project was designed to serve flood control and water-power development. 215 F. 2d, at 597. It is not for courts, however, to substitute their judgments for congressional decisions on what is or is not necessary for the improvement or protection of navigation. See *Arizona* v. *California,* 283 U. S. 423, 455–457. The role of the judiciary in reviewing the legislative judgment is a narrow one in any case. See *Berman* v. *Parker,* 348 U. S. 26, 32; *United States ex rel. TVA* v. *Welch,* 327 U. S. 546, 552. The decision of Congress that this project will serve the interests of navigation involves engineering and policy considerations for Congress and Congress alone to evaluate. Courts should respect that decision until and unless it is shown "to involve an impossibility," as Mr. Justice Holmes expressed it in *Old Dominion Co.* v. *United States,* 269 U. S. 55, 66. If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced. *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 426; *Oklahoma ex rel. Phillips* v. *Atkinson Co.,* 313 U. S. 508, 525, 533–534. As we said in the *Appalachian Power Co.* case, "Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control." 311 U. S., at 426.

The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That Clause speaks in terms of power, not of property. But the power is a dominant one which can be asserted to the

exclusion of any competing or conflicting one. The power is a privilege which we have called "a dominant servitude" (see *United States* v. *Commodore Park, Inc.*, 324 U. S. 386, 391; *Federal Power Commission* v. *Niagara Mohawk Power Corp.*, 347 U. S. 239, 249) or "a superior navigation easement." *United States* v. *Gerlach Live Stock Co.*, 339 U. S. 725, 736. The legislative history and construction of particular enactments may lead to the conclusion that Congress exercised less than its constitutional power, fell short of appropriating the flow of the river to the public domain, and provided that private rights existing under state law should be compensable or otherwise recognized. Such were *United States* v. *Gerlach Live Stock Co.*, *supra*, and *Federal Power Commission* v. *Niagara Mohawk Power Corp.*, *supra*. We have a different situation here, one where the United States displaces all competing interests and appropriates the entire flow of the river for the declared public purpose.

We can also put aside such cases as *United States* v. *Kansas City Life Ins. Co.*, 339 U. S. 799, where assertion of the dominant servitude in the navigable river injured property beyond the bed of the stream. Here we are dealing with the stream itself, for it is in the water power that respondents have been granted a compensable interest.

It is argued, however, that the special water-rights value should be awarded the owners of this land since it lies not in the bed of the river nor below high water but above and beyond the ordinary high-water mark. An effort is made by this argument to establish that this private land is not burdened with the Government's servitude. The flaw in that reasoning is that the landowner here seeks a value *in the flow of the stream,* a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses. It is no answer to say that payment is

sought only for the location value of the fast lands. That special location value is due to the flow of the stream; and if the United States were required to pay the judgments below, it would be compensating the landowner for the increment of value added to the fast lands if the flow of the stream were taken into account.

That is illustrated by *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, the case that controls this one. In that case a private company installed a power project in St. Mary's River under a permit from the Government, revocable at will. The permit was revoked, Congress appropriating the entire flow of the stream for navigation purposes. The Court unanimously held that the riparian owner had no compensable interest in the water power of which it had been deprived. Mr. Justice Lurton, speaking for the Court, said, "Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." *Id.*, at 69. The Court accordingly reversed a judgment that awarded the riparian owner what respondents have obtained in this case, *viz.*, "the present money value of the rapids and falls to the Chandler-Dunbar Company as riparian owners of the shore and appurtenant submerged land." *Id.*, at 74. The Court said, "The Government had dominion over the water power of the rapids and falls and cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use."* *Id.*, at 76. Some of the land owned by the pri-

---

*In the *Chandler-Dunbar* case, an award of compensation was made for the value of the land for a lock and canal, passing "around the falls and rapids." *United States* v. *Chandler-Dunbar Co.*, 229 U. S., at 67, 76–78. It may be that the Court was influenced by the fact that, on the special facts of the case, the use of the land for canals and

vate company was in the bed of the stream, some above ordinary high water. But the location of the land was not determinative. It was the dominion of the Government over the water power that controlled the decision. Both in *Chandler-Dunbar* and in this case it is the water power that creates the special value, whether the lands are above or below ordinary high water. The holding in *Chandler-Dunbar* led us to say in *United States* v. *Appalachian Power Co., supra,* at 424, that the "exclusion of riparian owners" from the benefits of the power in a navigable stream "without compensation is entirely within the Government's discretion." And again, "If the Government were now to build the dam, it would have to pay the fair value, judicially determined, for the fast land; nothing for the water power." *Id.,* at 427.

The power company in the present case is certainly in no stronger position than the owner of the hydroelectric site in the *Chandler-Dunbar* case. While the latter was deprived of a going private power project by the Government, the present private owners never had a power project on the Savannah and as a result of the Government's pre-emption never can have one.

It is no answer to say that these private owners had interests in the water that were recognized by state law. We deal here with the federal domain, an area which Congress can completely pre-empt, leaving no vested private claims that constitute "private property" within the meaning of the Fifth Amendment. Location of the lands might under some circumstances give them special value,

---

locks was wholly consistent with the dominant navigation servitude of the United States and indeed aided navigation. Whatever may be said for that phase of the case, it affords no support for respondent, since water-power value, held to be compensable by the Court of Appeals, was ruled to be noncompensable in the *Chandler-Dunbar* case.

as our cases have illustrated. But to attach a value of water power of the Savannah River due to location and to enforce that value against the United States would go *contra* to the teaching of *Chandler-Dunbar*—"that the running water in a great navigable stream is capable of private ownership is inconceivable." 229 U. S., at 69.

The holding of the *Chandler-Dunbar* case that water power in a navigable stream is not by force of the Fifth Amendment a compensable interest when the United States asserts its easement of navigation is in harmony with another rule of law expressed in *United States* v. *Miller*, 317 U. S. 369, 375.

"Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. Thus, although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value."

The Court in the *Chandler-Dunbar* case emphasized that it was only loss to the owner, not gain to the taker, that is compensable. 229 U. S., at 76. If the owner of the fast lands can demand water-power value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. The right has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys. Cf. *U. S. ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 273 *et seq.* To require the United States to pay for this water-power value would be to create private claims in the public domain.

*Reversed.*

Mr. Justice Burton, with whom Mr. Justice Frankfurter, Mr. Justice Minton, and Mr. Justice Harlan join, dissenting.

The issue here is the determination of the compensation which, under the Fifth Amendment, must be paid for privately owned fast land adjoining a navigable stream when such land is taken by the United States for a public use. For the reasons hereafter stated, I agree with the courts below that the proper measure of such compensation is the fair market value of the land at the time it is taken, and that this includes recognition of any fair market value of the land that is due to its riparian character.

This issue has confronted the United States ever since it proposed to construct a multipurpose dam across the Savannah River, and found it necessary to acquire privately owned land on which to locate its Clark Hill dam, plant and reservoir. Part of the needed land lay in South Carolina on the north bank of the river and the remainder on its south bank in Georgia. Of the 70,000 or more acres thus required, about 4,700, at the heart of the project, are the ones before us. Those in South Carolina are owned by the Twin City Power Company, a South Carolina corporation. Those in Georgia are owned by the Twin City Power Company of Georgia, a Georgia corporation. The latter is a wholly owned subsidiary of the former and the two will be referred to as Twin City.

In 1947, the United States, in seven proceedings, but under a single program, took possession of the 4,700 acres. It filed four actions in the United States District Court for the Western District of South Carolina, and three in the corresponding court for the Southern District of Georgia. Each sought to condemn the title to some of the property taken and to fix the compensation to be paid for it.

Because of the necessity for proceeding in two jurisdictions, the compensation issue has been passed upon by

two District Courts and two Courts of Appeals, as well as by three Commissioners appointed jointly by the District Courts to recommend the compensation to be paid. All of the opinions rendered have held that the fair market value of the land taken should include recognition of the value of its location, availability and exceptional suitability for use as a dam site, plant site or reservoir basin incidental to a water-power development. By doing so, they have expressly declined to limit their estimates of the fair market value of the Twin City land merely to its market value for agricultural purposes and the supplying of timber as contended by the Government.[1]

For over 50 years, the land in question has been the subject of frequent consideration and negotiation in connection with the proposed construction of some dam to raise the level of the Savannah River from 60 to 100 feet in that vicinity. Twin City was organized for the development of a hydroelectric plant in this area and began acquiring this property for that purpose in 1901. By 1911, it owned practically all of the land necessary for an integrated site for a hydroelectric power project with a

---

[1] See opinion of District Judge Wyche speaking, in 1949, for the District Courts for the Western District of South Carolina and the Southern District of Georgia, 86 F. Supp. 467; report of Commissioners, in 1953 (R. 14); opinion of District Judge Wyche confirming, in 1953, the Commissioner's report which also was confirmed by District Judge Scarlett for the Southern District of Georgia, 114 F. Supp. 719; opinion of District Judge Wyche, sitting with District Judge Scarlett, overruling, in 1953, motion to amend findings and enter a new judgment (R. 55); opinion of Chief Judge Parker, in 1954, joined by Circuit Judges Soper and Dobie, constituting the Court of Appeals for the Fourth Circuit, 215 F. 2d 592; and opinion of Chief Judge Hutcheson, in 1955, joined by Circuit Judge Holmes and District Judge Dawkins, constituting the Court of Appeals for the Fifth Circuit, 221 F. 2d 299. See also, opinion rendered, in 1947, in *Savannah River Electric Co.* v. *Federal Power Commission,* 164 F. 2d 408, by the Court of Appeals for the Fourth Circuit.

60-foot head at Price's Island.[2] Under six Acts of Con-
gress, passed between 1901 and 1919, Twin City was
authorized to build power dams in the Savannah River
at Price's Island utilizing the land involved here. The
Secretary of War and the Chief of Engineers of the United
States approved those plans. The land before us included
an excellent dam site where the river narrowed to 900
feet. At appropriate points, the land included sound
foundation rock and much clay suitable for earth dam
purposes. The stream flow at Price's Island exceeded
that of most hydro developments in North Carolina,
South Carolina or Georgia. At all material times, there
has been an ample and growing market for the electrical
energy to be produced. The area contained substantially
no improvements requiring removal and was suited for a
reservoir basin extending 11 or more miles up the river.

In 1925, the Federal Power Commission granted Twin
City a preliminary permit for a development at Price's
Island involving a dam with a 60-foot head of water. In
1926, the Southeastern Power & Light Company negoti-
ated with Twin City for the purchase of its land. Shortly
thereafter, the Savannah River Electric Company inter-
vened and obtained a license from the Commission to
construct a 90-foot dam for a hydroelectric development
which would have absorbed the land now before us. The
Savannah River Electric Company also instituted, but
later abandoned, proceedings to condemn the Twin City

---

[2] Twin City's 4,700 acres would include all except about 170 acres
of the land and rights necessary for the location of a dam, plant and
reservoir basin with a 60-foot head of water at Price's Island. A
60-foot head at that point with a 5-foot surcharge would require
about 400 additional acres instead of 170, a 70-foot head with a
5-foot surcharge, 1,250 acres, and an 80-foot head with a 5-foot
surcharge, 2,800 acres. The Twin City land was not only available
but essential for such developments in the vicinity of Price's Island.
Cf. *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266; *Olson* v.
*United States,* 292 U. S. 246.

property. After World War II, the Savannah River Electric Company applied to the Commission for a permit to construct a dam for the development of water power at a point almost identical with the Clark Hill site. That proposal called for occupation of the Twin City land and negotiations for its purchase were renewed. By then, however, the United States had made plans for its own comprehensive improvement of the Savannah River for flood control, navigation and power purposes. In 1944, Congress had authorized the Clark Hill project. 58 Stat. 894. In 1947, the efforts of the Savannah River Electric Company came to an end with its unsuccessful petition for a federal license.[3] In that year, the Government took possession of the land for its present Clark Hill project, calling for a 130-foot dam about six miles below Price's Island and for the complete absorption of the Twin City land.

Included in the 4,707.65 acres to be evaluated are 4,519.15 acres owned in fee, and 188.50 over which Twin City merely has flowage rights.[4] The latter are significant because a market for flowage rights is a recognition of a special value of the land for that use.

There is no need to discuss here the question whether the Clark Hill project, as authorized by Congress, is primarily in the interest of navigation, rather than of flood control or power development, for, in any event, the United States has the power of eminent domain. By

---

[3] *Savannah River Electric Co.* v. *Federal Power Commission, supra.*

[4] These 188.50 acres are those on which the flowage rights have been found by the lower courts to be valid and enforceable, as distinguished from the 745.58 acres of "options" which have been treated by the lower courts as unenforceable. The flowage rights were acquired by Twin City through deeds of purchase and, for reservoir purposes, they are as valuable as a title in fee. They evidence a control over riparian land without which water rights are useless for the development of a hydroelectric project.

payment of just compensation, it may acquire whatever private property may be necessary and appropriate for the project, including the Twin City fast land and flowage rights.

There also is no need to discuss the traditional servitude, generally referred to as the navigation servitude, which the United States enjoys within the banks and bed of the Savannah River. All of the Twin City land and flowage rights involved are located above and beyond the ordinary high-water mark of the river. It is conceded that the United States has a right to exercise its navigation servitude without payment of compensation within the limits of the servitude. There is no claim made here for payment for any value in the flow of the stream, for any part of the bed of the river or for any land below the ordinary high-water mark of the river.[5]

> "It is not the broad constitutional power to regulate commerce, but rather the servitude derived from that power and narrower in scope, that frees the Government from liability in these cases [*United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592, and *United States* v. *Willow River Power Co.*, 324 U. S. 499]. When the Government exercises this servitude, it is exercising its paramount power

---

[5] The answers filed by the condemnees in this action were so construed by the District Court. The United States, relying on *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, moved to strike portions of the amended answers filed by the condemnees. In denying these motions, the District Court said:

". . . But, I do not understand that the condemnee by its answers claims to have any private property right in the 'water power capacity' or the 'raw water' of the river; neither has it built, nor does it own, any structures in the stream for which it claims compensation. On the contrary, its claim is limited to the fair market value of its *fast* lands, based upon 'the most profitable use to which the land can probably be put in the reasonably near future.'" *United States* v. *1532.63 Acres of Land*, 86 F. Supp. 467, 476.

in the interest of navigation, rather than taking the private property of anyone. The owner's use of property riparian to a navigable stream long has been limited by the right of the public to use the stream in the interest of navigation. See Gould on Waters, c. IV, §§ 86–90 (1883); I Farnham, Waters and Water Rights, c. III, § 29 (1904). This has applied to the stream and to the land submerged by the stream. There thus has been ample notice over the years that such property is subject to a dominant public interest. This right of the public has crystallized in terms of a servitude over the bed of the stream. The relevance of the high-water level of the navigable stream is that it marks its bed. Accordingly, it is consistent with the history and reason of the rule to deny compensation where the claimant's private title is burdened with this servitude but to award compensation where his title is not so burdened." *United States* v. *Kansas City Ins. Co.*, 339 U. S. 799, 808.[6]

Similarly, there is no controversy here between the United States, any State, or private landowner as to the paramount right of the United States to take possession of the land in question for the purposes stated. Unlike the situation in *Federal Power Commission* v. *Niagara Mohawk Corp.*, 347 U. S. 239, there are no vested water rights claimed here under state law. Twin City does not contest the right of the United States to develop the

---

[6] Following the above statement, we illustrated, in a footnote, the limitation of the servitude to the bed of the stream as fixed by its ordinary high-water mark. We showed that in the *Chicago* case, *supra,* this Court permitted the overflowing, without compensation, of land within the bed of the stream but denied application of the servitude to nearby land outside of the bed of the stream. The Court also remanded that case for a determination of whether or not certain other lands were within the bed of the stream.

power resources of the river. It asks only that, to the extent that the United States takes private fast land for public use, it shall pay its fair market value, including its fair market value for riparian uses.

". . . The statement in that opinion (p. 326) [*Monongahela Navigation Co.* v. *United States,* 148 U. S. 312] that 'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner' aptly expresses the scope of the constitutional safeguard against the uncompensated taking or use of private property for public purposes. *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 399.

"That equivalent is the market value of the property at the time of the taking contemporaneously paid in money. . . .

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. *Boom Co.* v. *Patterson,* 98 U. S. 403, 408. *Clark's Ferry Bridge Co.* v. *Public Service Comm'n,* 291 U. S. 227. 2 Lewis, Eminent Domain, 3d ed., § 707, p. 1233. 1 Nichols, Eminent Domain, 2d ed., § 220, p. 671. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the

possibility of combination is reasonably sufficient to affect market value." [7] *Olson* v. *United States,* 292 U. S. 246, 254–256.

In the instant case, the Commissioners, the District Courts and the Court of Appeals have applied the above rule. The Commissioners considered all elements of value which they could ascertain with reasonable accuracy, provided those elements were sufficiently assured to be reflected in the fair market value of the premises.[8]

---

[7] Near this point, there also appears the following statement which has significance here in view of the competition between Twin City and others prior to the taking of the land in question by the United States:

". . . It is common knowledge that public service corporations and others having that power [of condemnation] frequently are actual or potential competitors, not only for tracts held in single ownership but also for rights of way, locations, sites and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account." 292 U. S., at 256.

See *United States ex rel. T. V. A.* v. *Powelson, supra,* at 275; and also *Grand River Dam Authority* v. *Grand-Hydro,* 335 U. S. 359; *United States* v. *Miller,* 317 U. S. 369; *McCandless* v. *United States,* 298 U. S. 342; *City of New York* v. *Sage,* 239 U. S. 57; *Boom Co.* v. *Patterson,* 98 U. S. 403, 407–408.

[8] The following are excerpts from the Commissioner's report:

". . . By reason of their geographical location, these lands and other property rights of Twin City had a peculiar value for water power purposes . . . .

". . . all the witnesses, in the main, had taken the steam plant comparison method as one of the principal bases for arriving at the water power value of the property of Twin City . . . . In that connection, we wish to make it clear that the figure arrived at by the so-called 'steam plant comparison method' [$1,600,000], was not taken as an absolute guide, or basis, but was used as one of the principal bases, together with numerous other factors considered by these expert witnesses . . . ."

In confirming the report of the Commissioners, the District Court said:

> "Since the award to Twin City of $1,257,033.20 is not the value of its property for any particular purpose but represents its fair market value after considering all of the reasonable uses of the property which were not too remote or speculative, this amount is the 'just compensation' required by the Fifth Amendment and the applicable statutes. . . . This is the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy." 114 F. Supp., at 725.

The potential use of this land for dam, plant and reservoir purposes is far from speculative in the light of the 50 years of recognition of its availability and suitability for those purposes. The land was accumulated by Twin City for this very purpose and it is now flooded as part of the Clark Hill project. The steam-plant comparison computations made by the Commissioners are substantially uncontroverted. If a purchase price had been sought by negotiation in 1947, it is inevitable that a primary consideration would have been the value of the flowage rights and of the dam and plant locations in relation to water-power development. We cannot realistically imagine that such a negotiation would have been limited to a consideration of the land's timber and its minor value for agricultural uses.[9]

---

[9] The estimate which the Commissioners made of the value of the land based upon its timber and agricultural value, plus an allowance of $5 per acre for the assembly of the title under a single ownership, was about $37 per acre in South Carolina and $31 per acre in Georgia, producing a total of $150,841.85. This contrasts with the $267.02 per acre, and a total "just compensation" of $1,257,033.20, approved by the Commissioners and the courts below.

The value recommended by the Commissioners and approved by the courts below includes nothing for strategic or "hold-up" value. It reflects no inflation due to the "taking" of the property by the Government and no deflation due to the absence of other bidders after the Government announced that it would take the property. There was nothing condemned or valued that could be described as "in the flow of the stream." Only the fast land was taken and valued. It is because of that land's location near, but apart from, the flow of the stream that an additional fair market value, long recognized in this land, was recommended and approved below. The location of land is always a factor, and often a primary factor, in determining its market value. Every public utility exercising the right of eminent domain is required to pay it.

Before passage of the Water Power Act, the paramount, but unexercised, right of the Government to control the water power in the Savannah River did not exclude the development of that river under state control. The Water Power Act imposed additional conditions and provided for federal licensing. See *Federal Power Commission* v. *Niagara Mohawk Corp.,* 347 U. S. 239, and *Grand River Dam Authority* v. *Grand-Hydro,* 335 U. S. 359. But, even though a federal license then became generally necessary, a substantial market for the fast land still existed, because of its importance to any licensee. Up to the time of its "taking" of the property, the Government was but one of several prospective purchasers.

After the Federal Government announced that it would, itself, develop and use the water power, it still had to acquire fast land for its dam and plant site and for its reservoir basin. Although its taking of the property cut off further competitive bids for the land, the Government had the *same constitutional obligation to*

*pay "just compensation"* for whatever private property it took.

A classic comment upon a comparable situation was made by this Court when the Federal Government, after condemning a lock and dam, sought to pay only for the tangible property taken, without recognizing the established value of a franchise issued by a State to exact tolls for the use of the canal and lock. In requiring recognition of the latter value, the Court said:

> "And here it may be noticed that, after taking this property, the government will have the right to exact the same tolls the Navigation Company has been receiving. It would seem strange that if by asserting its right to take the property, the government could strip it largely of its value, destroying all that value which comes from the receipt of tolls, and, having taken the property at this reduced valuation, immediately possess and enjoy all the profits from the collection of the same tolls. In other words, by the contention this element of value exists before and after the taking, and disappears only during the very moment and process of taking. Surely, reasoning which leads to such a result must have some vice, at least the vice of injustice." *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 337–338.

While the United States enjoys special rights in relation to navigable streams, such as its navigation servitude, there is no good reason why, when the Government condemns private property for a public use, its condemnee should not receive from the Government the same measure of "just compensation" as from other condemnors. If the property taken is "private property," the constitutional compensation for it should be the same. That measure includes the "highest and most profitable use for which the property is adaptable . . . to the full extent

that the prospect of demand for such use affects the market value while the property is privately held." *Olson* v. *United States, supra,* at 255.

> ". . . No precedent has been advanced which suggests that a *different* measure of compensation should be required where the United States rather than the state is the taker of the property for a public project. Nor has any reason been suggested why as a matter of principle or policy there should be a *different* measure of compensation in such a case. . . .

> . . . . .

> ". . . The United States no more than a state can be excused from paying just compensation measured by the value of the property at the time of the taking merely because it could destroy that value by appropriate legislation or regulation." *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 278, 284. See also, *United States* v. *Cress,* 243 U. S. 316, 319, 326–327, 329–330.

The Government contends, however, that since it need not pay for appropriating the water in the stream, it should not be required to pay for any value in the fast lands that is predicated upon the riparian location of such lands, or their special value in relation to the use of that water. In this connection, the issues decided and the statements made by Justice Lurton for a unanimous Court in *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, are helpful. The *Chandler* case was a condemnation proceeding brought by the United States under a special Act of Congress relating to all the land and other property between the St. Mary's Falls Ship Canal at Sault Sainte Marie, Michigan, and the international boundary to the north. The United States "took" this land and property so as to improve navigation in these highly navigable waters. It exercised plenary control over the entire river

and over everything within its bed up to its ordinary high-water mark. It thus exercised its navigation servitude and eliminated, without compensation, a hydroelectric development which the Chandler-Dunbar Company had constructed on the latter's submerged land within the bed of the river. That elimination was no longer in issue in this Court. The principal questions related to the District Court's awards for water rights claimed by Chandler and for fast land owned by Chandler above and beyond the bed of the river.[10]

1. The District Court allowed Chandler $550,000 for the water rights. Chandler, however, established no vested right to such water under state law and this Court disallowed the entire claim. It said:

". . . Unless . . . the water power rights asserted by the Chandler-Dunbar Company are determined to be private property the court below was not authorized to award compensation for such rights.

". . . Ownership of a private stream wholly upon the lands of an individual is conceivable; but that the running water in a great navigable stream is capable of private ownership is inconceivable." *Id.*, at 69.

That conclusion is not questioned.

2. In fixing compensation to Chandler for its strip of eight acres of fast land, the District Court allowed for "use for canal and lock purposes, an additional value of $25,000," and for a smaller area consisting of two other parcels of fast land for "its special value for canal and lock purposes an additional sum of $10,000." *Id.*, at 75.

---

[10] The allowances of value are here discussed in the following order: (1) for water rights; (2) for value of land for canal and lock purposes; (3) for value of land for general purposes; and (4) for value of land for factory sites contingent upon availability of surplus privately developed electric power. In the text of the *Chandler* case, at pages 74–75, the value of canal and lock purposes is treated last.

These allowances of additional value for fast lands, due to their suitability and availability for canal and lock purposes, are significant for our present purposes. The Court explained them as follows:

". . . That this land had a prospective value for the purpose of constructing a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, *it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose.* Lewis on Eminent Domain, § 707. *Boom Co.* v. *Patterson,* 98 U. S. 403, 408; *Shoemaker* v. *United States,* 147 U. S. 282; *Young* v. *Harrison,* 17 Georgia, 30; *Alloway* v. *Nashville,* 88 Tennessee, 510; *Sargent* v. *Merrimac,* 196 Massachusetts, 171." (Emphasis supplied.) *Id.,* at 76–77.

Justice Lurton then reviewed and quoted at length from the opinions in *Boom Co.* v. *Patterson, supra,* and *Shoemaker* v. *United States, supra.*[11]

---

[11] Although erroneously referring to it as having been used in a lower court instruction in the *Shoemaker* case, Justice Lurton's quotation of the following language lends this Court's approval to it:

". . . 'the market value of the land includes its value for any use to which it may be put, and all the uses to which it is adapted, and not merely the condition in which it is at the present time, and the use to which it is now applied by the owner; . . . that if, by reason of its location, its surroundings, its natural advantages, its artificial improvement or its intrinsic character, it is peculiarly adapted to

Coupled with the reasoning of the Court and its quotations from earlier cases, these allowances support the position taken by the lower courts in the instant case. They are "additional values" allowed for the location, special suitability and availability of the riparian land for use in connection with the recognized future public use of the area. In fact, the uses for which the allowances are made are of the very same type as that for which the land has been condemned. There is no allowance for strategic or "hold-up" value. The *Chandler* case thus supplies specific authority for the decision of the lower courts in the instant case.

3. In fixing the compensation for the same eight acres and the smaller area, the District Court also made a basic allowance of $20,000 for the value of the strip "for all general purposes, like residences, or hotels, factory sites, disconnected with water power etc.," and $10,000 in relation to the smaller area for "general wharfage, dock and warehouse purposes." *Id.*, at 74, 75. This Court upheld both, thereby further demonstrating that the location of land is a proper element to be considered in determining "just compensation."

4. On the other hand, the District Court approved one other element of "additional value" in relation to these land areas which this Court rejected. In valuing the eight acres, the District Court allowed an "additional value" of $20,000 for "use as factory site in connection with the development of 6,500 horse power, either as a single site or for several factories to use the surplus of 6,500 horse power not now used in the city." *Id.*, at 74–75. Likewise, in valuing the smaller area, the District Court allowed an additional value of $5,000 in "connec-

---

some particular use—e. g., to the use of a public park—all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation.'" 229 U. S., at 78.

tion with the canal along the rapids, if used as a part of the development of 4,500 (6,500) horse power." *Id.,* at 75. It has been suggested that these rejections are in conflict with the Court's simultaneous approval of the additional values of the same land for canal or lock purposes. The Government also claims to find in these rejections some support for its opposition in the instant case to any allowance reflecting the favorable location of the fast land it has taken on the banks of the Savannah River.

The Court's reasons for rejecting these particular values in the *Chandler* case, as expressly stated by Justice Lurton, lend no such support to the Government's position in the instant case. He said:

> ". . . These 'additional' values were based upon the erroneous hypothesis that that company [Chandler-Dunbar] had a private property interest in the water power of the river, not possibly needed now or in the future for purposes of navigation, and that that excess or surplus water was capable, by some extension of their works already in the river, of producing 6,500 horse power.
>
> "Having decided that the Chandler-Dunbar Company as riparian owners had no such vested property right in the water power inherent in the falls and rapids of the river, and no right to place in the river the works essential to any practical use of the flow of the river, the Government cannot be justly required to pay for an element of value which did not inhere in these parcels as upland." *Id.,* at 75–76.

In other words, the rejected values were not part of the fair market value of the land for any assured use. They sought to recognize a value in the fast land for factory sites which were conditioned upon there being excess water in the stream not needed by the Government for

navigation, and further conditioned upon the development by Chandler of structures in the bed of the stream to develop 6,500 additional horsepower from this excess water. Not only was there found to be no such excess water but Chandler's potential power development within the bed of the stream was expressly disallowed. The rejection thus was due to the speculative nature of the proposed use and not to the favorable riparian location of the land for assured uses. It was thoroughly consistent with the Court's allowance of established values of the land for canal and lock purposes.

To accept the Government's position in the instant case would, in effect, extend its navigation servitude far above and beyond the high-water mark of the Savannah River. In the face of decisions uniformly limiting that servitude to the bed of the stream, the Government would take 4,700 acres of private property for a public use, substantially without compensation therefor. This would enforce the Government's right of condemnation, while repudiating its constitutional obligation to pay for the private property taken.

The justice of sustaining the interpretation placed on the Fifth Amendment by the courts below is emphasized in the following statements made by this Court in *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 324, 325:

"... The question presented is not whether the United States has the power to condemn and appropriate this property of the Monongahela Company, for that is conceded, but how much it must pay as compensation therefor. Obviously, this question, as all others which run along the line of the extent of the protection the individual has under the Constitution against the demands of the government, is of importance; for in any society the fulness and sufficiency of the securities which surround the individ-

ual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government. The first ten amendments to the Constitution, adopted as they were soon after the adoption of the Constitution, are in the nature of a bill of rights, and were adopted in order to quiet the apprehension of many, that without some such declaration of rights the government would assume, and might be held to possess, the power to trespass upon those rights of persons and property which by the Declaration of Independence were affirmed to be unalienable rights.

. . . . .

". . . And in this there is a natural equity which commends it to every one. It in no wise detracts from the power of the public to take whatever may be necessary for its uses; while, on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him."

For the foregoing reasons, the judgment of the Court of Appeals should be affirmed.