**UNITED STATES of America,**
**Plaintiff,**

**v.**

**100.00 ACRES OF LAND, MORE OR LESS, situate IN LIVINGSTON COUNTY, STATE OF KENTUCKY, et al., Defendants.**

**Civ. A. No. 2089.**

United States District Court,
W. D. Kentucky,
Paducah Division.

May 4, 1973.

George J. Long, U. S. Atty., Louisville, Ky., for plaintiff.

Paul R. Huddleston, Bowling Green, Ky., Ernest W. Rivers, Paducah, Ky., J. W. Blackburn, Jr., Louisville, Ky., B. M. Westberry, Marion, Ky., Keith & Kirkham, Hopkinsville, Ky., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

ALLEN, District Judge.

Following a two day bench trial, the transcription of the evidence and the filing of briefs by the parties, this action is now before the Court for decision as to the just compensation to be paid to the owners of what is known as "Dog Island" for the condemnation in fee simple by the Government of their ownership of approximately 105 acres of property, which has been taken by the Government for use in connection with the erection of a dam on the Ohio River, the project being known as the "Smithland Project".

Dog Island is located approximately eleven miles north of the City of Paducah, Kentucky, and is 600 feet east of the Illinois mainland and about one-half mile west of the Kentucky mainland. It lies at elevation 316 feet to 326 feet and contains about 90 to 95 acres of cleared land and approximately 10 acres of woodland.

Dog Island was purchased by Robert N. Frazer and Dorothy F. Frazer, his wife, in 1954 and sold in 1958 to C. E. Gordon and Bertha F. Gordon, his wife, although the Frazers retained a one-half mineral interest in the property. The property was used for agricultural purposes, and primarily for the production of corn from 1958 to 1966, when the United States leased it in anticipation of the taking for the Smithland Project. The property has never been used for mining purposes, although Mr. Frazer has been in the fluorspar business all of his life and retained, as stated above, a one-half mineral interest in the property.

The date of taking of the property was June 4, 1970, and the Court, pursuant to the ruling of the Sixth Circuit in the case of United States v. 79.39 Acres of Land in Breckinridge and Meade Counties, etc., 440 F.2d 1190 (1971), allowed testimony to be introduced as to alleged comparable sales both prior to that date and thereafter.

In this action, the condemnees have argued that the property has four highest and best uses, whereas the Government has insisted that its only best use is for agricultural purposes. The condemnees insist, and produced evidence to support their contentions, that the property could be used for a mooring site, for a fluorspar development, for hunting uses, and finally for agricultural purposes.

As might be expected, the values placed on the property, in light of the conflicting views as to the highest and best use of the property, produced widely varying estimates of the fair market value, ranging from $226,000 on the part of the landowners, to $21,200 on the part of the Government.

■ After examining all of the evidence and authorities relating thereto, the Court has concluded that the highest and best use of the property is agricultural, and that the fair and just compensation to be awarded is the sum of $28,250.

The landowners produced considerable testimony relating to the use of Dog Island for a barge terminal. One of their witnesses, Mr. Steve Fugate, a realtor with six years experience, testified that Livingston Point, which is used as a barge terminal, is some 13 miles from Dog Island on the Ohio River and is leased for $1,800 per month for that purpose. He came to the conclusion that a value of $206,000 should be placed on Dog Island, because he believed it could be adaptable for barge terminal purposes and mooring. Another witness for the defendants, Mr. Bill Williams, who is engaged in the sale of livestock and feed and has also purchased and sold land, testified to the same effect as to the lease on Livingston Point, and placed a fair market value of $220,000 on Dog Island, on the theory that it would yield a rental of $22,000 per year as a mooring site and barge terminal.

■ The United States objected to the introduction of this testimony on the basis of its speculativeness, but did not bring to the Court's attention the case of United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). That case is an absolute bar to the landowners' contention that they are entitled to recover the value of Dog Island arising out of its projected use as a barge terminal and mooring site. In that case, the respondents owned land along the Columbia River. They leased the land to the State of Oregon with an option to purchase, it being contemplated that the State would use the land as an industrial park, part of which would function as a port. The option was never exercised since the land was taken by the United States in connection with a lock and dam project for the development of the river. The United States then conveyed the land to the State of Oregon at a price considerably less than the option price. In the condemnation suit, the trial judge determined that the compensable value of the land taken was limited to its value for sand and gravel, and for agricultural purposes, and that its special value as a port site could not be considered. The ultimate award was about one-half of the claimed value of the land if used as a port.

The Ninth Circuit reversed, 367 F.2d 186 (1966), concluding that the port site values should be compensable, but the Supreme Court reversed the Ninth Circuit and upheld the District Court. In so doing, it relied upon its previous decision in United States v. Twin City Power Company, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), and pointed out on pages 124 and 125 of 389 U.S., page 268 of 88 S.Ct. that special value in both cases arises from access to and use of navigable waters. As was true in *Twin City*, "if the owner of the fast lands can demand port site value as part of his compensation, 'he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses . . . . To require the United States to pay for this . . . value would be to create private claims in the public domain'. 350 U.S., at 228 [76 S.Ct., at 263]."

■ Coming next to the value of Dog Island as a hunting preserve, defendants' witness Mr. Fugate described two hunting preserves as having been sold and which he thought were comparable to Dog Island. Both of these were fifty miles away and located in the Mississippi flyway. One consisted of 150 acres purchased in 1972 for $140,000 and the other consisted of 50 acres bought in March, 1970 for $35,000. The Court is of the opinion that these two sales are

not actually comparable because of the distance at which they are located from Dog Island.

On redirect examination, Mr. Fugate testified as to another hunting tract which sold for $100 per acre in 1960, consisting of 200 acres in Livingston County, Kentucky. These hunting premises were located about seven miles from Dog Island, and he believed that $160 per acre would be a fair price for the 200 acres.

Even if these sales were comparable, the Court has very serious doubts, under the *Rands* doctrine, as to whether the hunting values inherent in Dog Island would be compensable, since they are dependent upon the use of the navigable waters surrounding Dog Island and are made possible by reason of their access to the navigable waters of the Ohio River.

It should be pointed out that if Dog Island were to be considered as having a highest and best use for hunting purposes, such use would arise solely because of its use for duck hunting purposes, and that use, in turn, would arise from Dog Island's access to the navigable waters of the Ohio River.

We come next to the question of whether or not Dog Island's highest and best use is for fluorspar mining. There was testimony by Robert Frazer that 750,000 tons of fluorspar had been mined at Dyer Hill Mine, which is two miles north of Dog Island, and that the market price is $80 per ton. He testified that, although the geological survey map did not actually show fluorspar veins or faults running across Dog Island, that since they reached the shore lines of Illinois and Kentucky, across from the Island, he was certain that there was fluorspar on the Island. He admitted on cross-examination that the fluorspar faults were projected on the map rather than actually shown as existing to the banks of the Ohio River, since this was the alluvium part of the country where you can't see the outcrop. He stated that he had never drilled a hole on Dog Island and that you could drill many and still miss fluorspar if it were present. After testifying that there were 1,600 miles of fluorspar deposits in Western Kentucky, he said that if he reached a potential buyer, he would place a price of $100,000 on it.

John Tibbs, a geologist and engineer, was of the opinion that the geological survey map showing a projection of a fault on the mainland across from Dog Island warranted a conclusion that a fault existed on Dog Island. He stated that projections from the map were quite a common practice, but the raising of the waters in the Ohio River has affected the ability of the survey to adequately map the fault if it existed. (pp. 70, 71 of the Transcript). Tibbs testified over objection that the value of the mineral rights was $33,000. He also testified that sand alluvium makes it very hard to locate faults, but that they can be located by drilling.

Donald B. Saxby, Chief Geologist for Minerva Oil Company, Fluorspar Mining Division, was of the opinion that fluorspar may be found even where there are no actual faults and that minor fractures and replacements in beds that are not even associated with faults to the surface sometimes are more productive than faults themselves (p. 79 Tr.). He stated that from his experience a fault existed on Dog Island, and that the Island was in the ideal bearing horizon for 500 feet from the base of the bethel sandstone down into the St. Louis, and that these formations are present under Dog Island (p. 80 Tr.).

He testified that bedded fluorspar deposits constitute the largest single deposit of fluorspar in both Kentucky and Illinois, and that this deposit is being operated by Minerva and Ozark Mahoney, and that it projects toward Dog Island. Mr. Saxby testified that the potential value was $400 an acre to Minerva Oil as an option, and said this would be a reasonable market value, and based this on a $400 value per acre on fluorspar found in Hardin County, Illinois (p. 85 Tr.). He testified further that

the absence of a fault on a map does not mean the absence of fluorspar.

On cross-examination, he stated that normally faults run northeast to southwest and usually run straight but not always. He testified that he had done no drilling on Dog Island. He admitted that he had been testifying as to what the company would pay, and he explained that the company does not buy mineral rights outright but options property and if they find mineral then they buy the property (p. 93 Tr.). On the bottom of page 93, line 20, the following colloquy occurred:

"Q. So, you're basing your testimony solely on the potential that could exist on the island?

A. Yes."

Following that colloquy, the Government moved to strike all of Saxby's testimony and the Court reserved its ruling.

In opposition to these witnesses, the Government produced Marvin D. Semion, John Donan, Jr. and John Donan, Sr. While none of these three Government witnesses specialize in the field of fluorspar, all are qualified geologists and John Donan, Jr., has a degree also in geological engineering. Mr. Semion is Chief of the Geology Section, Corps of Engineers at Nashville. Summarizing their testimony, Dog Island can be described as having about 50 feet of alluvial material and 2 feet of top soil. It has a St. Genevieve formation which is comprised of limestone or dolomitic limestone, subject to solution by circulation of ground water (pp. 225, 226 Tr.).

The Government took 149 core borings on Dog Island, mostly of the 3″ diameter type, which went as far below the surface as 250′. The borings were concerned primarily with obtaining solid footings for the dam and not mineralization, but there was testimony by Semion that there was no evidence from the borings of any faulting on Dog Island and that no fluorspar was observed there (p. 244 Tr.).

Messrs. Donan, Sr. and Donan, Jr., both came to the conclusion that there is no fluorspar on Dog Island, and that even if there is, it would be uneconomical to mine the fluorspar. Both of them reached the conclusion as to the non-existence of fluorspar on the basis of the logs furnished by the Government. Both had to admit that bedded fluorspar deposits do not all lie along a mapped fault and that these deposits may be found and are found at generally 400′ to 500′ below the surface (pp. 257, 278, 471, 473, 474 Tr.).

With regards to the economics of fluorspar mining on Dog Island, both Donans testified that a space of about 40 to 50 acres would be required on which to locate the milling equipment, the shaft and the slurry ponds and pits (pp. 261, 474 Tr.).

In addition, Donan, Jr. testified to the problems that could be caused by flooding of a fluorspar mine shaft, inasmuch as Dog Island is subject to floods and lies below the flood plane. He based his testimony to this effect upon an experience which occurred at the Silver Mine two miles east under the Cumberland River (pp. 264, 265 Tr.). He had not actually been to see the Silver Mine, and his testimony was based upon what Mr. Moody told him.

Summarizing the conflicting testimony about the presence or absence of fluorspar on Dog Island, it can be fairly said that neither the plaintiff nor the defendants have proved one or the other element to the satisfaction of this Court. The burden of proof, of course, is upon the landowner to establish the presence of fluorspar on Dog Island. Although its experts are more versed in the field of fluorspar than are the Government experts, defendants do not establish that there is actually fluorspar on the Island by a preponderance of the evidence. In the case of United States v. 79.95 Acres of Land, etc. In Rogers County, State of Oklahoma, 459 F.2d 185 (10th Cir. 1972), p. 187, Circuit Judge Barrett points out "International contends that the undeveloped acreage had a certain value for oil reserves and that it is common in the industry to hold undeveloped

acreage for future development. While this is true, the record reflects that four other operators preceded International over a span of years and that none had undertaken any exploration or development operations on the subject properties. *This is indicative that the properties were not worth developing."* (Emphasis added).

The court in 79.95 Acres of Land, etc., supra, pointed out that the Government expert who examined cores testified that there was no oil underlying these lands, and that the court appreciated the fact that there can be no absolutes in the speculative area of oil reserves. Reliance must necessarily be placed on expert testimony.

This Court believes that in the light of the fact that the landowners made no exploration of the sub-surface to determine whether there was any fluorspar during the twelve years from 1954 to 1966 is indicative that the properties were not worth developing for that purpose. This is especially true where the owner of one-half of the mineral rights is a man who has been in the fluorspar business all of his life. The Court concludes that the landowners have failed to establish that the highest and best use of Dog Island is for mineral rights and the development of fluorspar.

In arriving at an opinion as to whether or not Dog Island is potentially valuable for its mineral rights, the Court has taken into consideration such cases as United States v. Silver Queen Mining Company, 285 F.2d 506 (10th Cir. 1960); United States v. 287.89 Acres of Land, etc. In Clearfield County, Commonwealth of Pennsylvania, 241 F.Supp. 456 (D.C.W.D.Pa.1965); Montana Railway Company v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681 (1890).

In *Silver Queen Mining Company,* supra, the mining engineers, geologists and metallurgists who testified on behalf of the landowners expressed their opinions that the lands were potentially valuable as mining properties, although largely undeveloped and unproven; that surface showings and samples taken from a shaft sunk years before indicated the presence of an ore body containing some silver and copper, and definitely valuable as a deposit of fluorspar; that the claims were worthy of development and would, in their opinion, prove successful; and that they would recommend the expenditure of development money.

These witnesses also testified that unproven claims such as these were not sold outright for cash, and that when disposition of such properties were made, it was under a lease-option arrangement and that usually the lessee would spend money for development of the property, and the owner was guaranteed a percentage of receipts from ores produced; and that when the percentage payments reached an agreed total, the properties became the exclusive property of the developer. If the lessee chose to abandon the property after making a guaranteed expenditure, he could do so and the property would then revert to the owner.

The witnesses expressed their opinions that such a lease-option arrangement could be successfully negotiated, and that the total purchase price would be $200,000, payable entirely out of potential ore shipments and without any downpayment in cash. Various estimates of the cost of development were express as being up to $50,000. The jury verdict of $50,000 was upheld by the Appellate Court, where the Government witnesses testified that the value of the property was nil insofar as mining was concerned.

The court stated that although "[s]ome speculation is inherent in the ascertainment of value of all resource property, be it mineral, oil, gas or otherwise, and if the quality of proof of value follows the custom of the industry, is the best available, and is sufficient to allow the jury or court to make an informed estimate as to the fact of value, such proof is sufficient to meet the burden." The court stated that the verdict of the jury was not based on pure speculation but was rather an informed finding based upon competent evidence,

reaching a standard dictated by the nature of the case. The court pointed out that the Government had possession of the property for 18 years which had prevented any effort at development during that period.

In Judge Marsh's opinion in *287.89 Acres of Land, etc.*, supra, he held that the sale of developed clay land approximately 100 to 120 miles distant from the condemned property was entitled to consideration, since it involved similar types of mineral resources. He cited United States v. 84.4 Acres of Land, etc., 224 F.Supp. 1017 (D.C.W.D.Pa. 1963); Virgin Island Housing Authority v. 15.5521 U.S. Acres of Land, 230 F. Supp. 845 (D.C.V.I.1964).

In Judge Marsh's case, drill holes had been made which disclosed the presence of flint clay which was suitable for manufacturing refractors, although only three of the eleven drilled holes disclosed such presence.

In United States v. 620.00 Acres of Land, etc. In Marion County, Arkansas, 101 F.Supp. 686 (D.C.W.D.Ark.1952), the opinion pertains to the taking of a 40 acre tract in Arkansas. The case was tried before a jury which awarded $60,000. The landowner's testimony ranged from $400,000 to $600,000, whereas the Government's testimony was $800. The difference was based upon the fact that the defendant's witnesses valued the tract on the basis of limestone deposits, while the Government witness did not consider the presence of such deposits. On a motion for a new trial, the District Court set aside the jury verdict and stated that the evidence presented by the landowners must be more specific as to the suitability and the availability of a quarry, considering all factors, such as, but not necessarily limited to, plant expense operation expense, distribution and the presence of or reasonable probability of a commercial market. Judge Miller stated in his opinion that the landowner's witnesses based their opinion as to the value upon the royalties that would be received by her from quarry operations in the next ten to twenty-five years from a physical plant costing $250,000 to $350,000. He stated that it was hardly possible that a prospective purchaser would be guided by the chance of somebody investing $300,000 in equipment and conducting quarrying operations over a period of fifteen to twenty years.

Taking into consideration these authorities, it would seem that the landowners have produced evidence as to mineral values but have not supported it with underlying data which is sufficient to warrant the conclusion that the subject property has a more than nominal value for mineral purposes. None of the defendants' witnesses testified as to the cost of obtaining a shaft, milling equipment, building of slurry ponds and drilling of holes. In two instances, those of Mr. Tibbs and Mr. Saxby, a flat price was arrived at based upon their opinion that fluorspar deposits were present as of the date of taking. The third witness, Mr. Frazer, did testify on redirect that there were sales of similar property. One of the sales, however, that to Reynolds Metals Company which was on a $500 per acre basis, was of property that had already been mined and, therefore, definitely had fluorspar present. It was based on a $40,000 cash payment and the payment of an additional $10,000 by May 1, 1973, or return of the property to the landowner (p. 539 Tr.). Another sale he mentioned involved 600 acres for $450 per acre and required a minimum payment of $7,000 per year. Another sale was 2,000 acres to Reynolds Metals for $125 per acre (p. 538 Tr.).

It is to be noted that in each of these sales the amount of land sold was substantially larger than Dog Island, which would seem to bear out the Government's witnesses at least to some extent in their determination that it is not economically feasible to mine for fluorspar in an area as small as Dog Island. This testimony becomes more significant in light of the landowners' failure to rebut it on redirect examination.

Another factor to be given weight by the Court is the inconsistency between use of the property for mining and use as an agricultural property. The landowners seem to contend that both uses can be made simultaneously. If the tract is to be valued on a per acre basis for minerals, this would contemplate use of the entire tract for minerals. If only 50 acres are to be used for minerals, then that 50 acres could be valued on that basis, assuming that it is the highest and best use, and the remaining value on the basis of agricultural use.

Again, it would seem that in order to conduct a profitable operation, assuming that fluorspar is present, exploration would have to be made on all portions of the Island, and this would necessarily interfere with its use for farming purposes.

With respect to the question of the feasibility of a fluorspar mine on the Island, the one-half mineral owner, Mr. Frazer, had to admit that in order to escape problems from flooding water, the mine shaft would have to be located above the flood plane. This cannot be accomplished on Dog Island and he was not certain where a suitable mine shaft could be dug which would be above the flood plane.

The Government witnesses, John Smith, Robert Stroube, A. J. Reed, and Tony Harris all testified the highest and best use of Dog Island was for agricultural purposes. Of these witnesses, John Smith appears to be most highly qualified, having been a realtor since 1952, a member of the American Institute of Real Estate Appraisers and the Kentucky Association of Real Estate Appraisers, and having taken four courses in appraising. He, Stroube and Reed all testified from comparable sales the total number being five. Smith was of the opinion that Dog Island had a fair market value of $21,200. His four comparable sales were as follows:

*Merrill to Harris* in 1968, consisting of 316 acres which sold for $20,100. He said that there were 65 acres of good bottom land and 50 acres of upland bottom, and 201 acres of rough woodland which would have very little value (p. 309 Tr.)

*Davis to Quinn* sale he described as having 68 acres of river bottom, 45 acres of upland and the remainder in wooded pasture. Sale was of 191 acres for $38,275 on December 20, 1969. He said that there was a better road involved than the subject property had (p. 315 Tr.).

The third sale was *German to Bryant* on December 31, 1965, 130 acres with a gravel road sold for $154 per acre which he adjusted to $200 per acre because of the five year difference between the date of sale and the date of condemnation. He considered inflation to be responsible for a 6.3% increase per year in real estate values in that area.

His next sale was *Neftzger to Harris* on December 31, 1969, 156 acres for $128 per acre. He stated that the access was not so good and that it was a dirt road. The fourth tract of land which he compared to the subject tract is directly across from the condemned property, and respectively the other tracts are 4 miles, 3 miles and 2½ miles distant from the subject property.

Stroube used three of the same sales as did Smith, and his fourth sale was *Harper to Burchett* in 1969, consisting of 239 acres which sold for $205 per acre. He believed the Burchett property to be not quite as productive as the 90 acres of Dog Island, and came up with a value of $225 per acre for that acreage. His evaluation as to the fair market value of Dog Island was $21,500, representing $204 per acre for the entire tract.

Reed described Dog Island as having real high productive soil, with 85–90% in crop land. He classified the 90 acres of crop land at $250 per acre and reached the conclusion that Dog Island was worth $23,000 or $227 per acre.

While it was developed on cross-examination that the land involved in each of the comparable sales varied in some aspect to Dog Island, it is the opinion of the Court that generally speaking these

sales are comparable and are to be considered as the best evidence of the value of Dog Island. Without detailing all of the aspects of how the land involved in the various sales differ from Dog Island, suffice it to say that the Court has reached the conclusion that a value of $300 per acre for agricultural should be placed upon 90 acres of Dog Island. The land in question is highly productive, has no erosion problems and is susceptible of relatively easy access by bridge. Drinking water without cost to the landowners is afforded by the Ohio River, and no fences or fertilizer are used, although one of the witnesses, Harris, testified that this was because of sand in the soil, and that use of fertilizer was not feasible, but would result in a higher yield of corn if it could be used. The remaining 10 to 15 acres of Dog Island consists of cotton-woods and other trees, and a fair evaluation for them would be at the rate of $85 per acre, or $1,250 (see testimony of Stroube), making a total just compensation to be paid of $28,250.

The landowners did introduce testimony by their real estate experts as to alleged comparable sales. Mr. Bill Williams cited three comparables, the first of which was Bennett to Reed Crushed Stone Company, November 1, 1968, consisting of 104 acres at a price of $1,333.-33 per acre. He believed it to be comparable on the ground that it was in the vicinity of a highway traffic exchange, whereas Dog Island was in the area of a river traffic exchange. His second sale was 116 acres, Cooper to Reed Crushed Stone Company, November 30, 1966, consisting of 137 actual acres described as 116 acres for $45,000. A third sale was Kelly Walker to Reed Crushed Stone Company, March 1, 1967, consisting of 40 acres at $625 per acre.

On cross-examination and direct testimony of Government witnesses, it was developed that the first of these sales was bought because of its proximity to the projected interchange of I–24 and Highway 453. It was also to be used for the placing of overburden from the quarry pits operated by the grantee, and

for the disposition of waste and processing of special sands and silicon, and the properties are some 21 miles south of Dog Island.

■ The Court is of the opinion that the lands involved in these sales are not basically comparable to Dog Island in that their primary purchase was for industrial and commercial uses, and not for farming uses. Secondly, they are located some 21 miles distance from Dog Island, which, while not an absolute bar to their use as comparable sales, diminishes their vitality in that respect.

■ With regard to the defendants' arguments concerning the introduction of testimony on rebuttal to the effect that Dog Island yielded income of $15,000 per year from farming uses, the Court does not attach much weight to that testimony. As stated in United States v. Ham, 187 F.2d 265 (8th Cir. 1951):

> "Use value as reflected by net income as a criterion by which to determine market value of farm lands has many frailties because it is dependent upon many uncertain and variable factors. Among these may be mentioned skill of husbandry, weather conditions, market conditions, cost of labor, cost of fuel, cost of machinery, depreciation of machinery, taxes on the land, taxes on the machinery and many other factors wholly unrelated to the fertility or productivity of the soil or its capacity to produce."

Had the landowners produced this testimony on direct, the Court would have been inclined to allow its introduction, subject to extensive cross-examination by the Government. It seems to the Court that the attempt to introduce this testimony during the last minutes of the trial on rebuttal without any proffer of documentary evidence to substantiate it warrants the Court in giving little or no weight to it.

Counsel for the United States may prepare judgment in accordance with these findings of fact, conclusions of law and opinion.