**UNITED STATES of America,**
**Plaintiff,**

v.

**133.79 ACRES OF LAND, MORE OR LESS, IN SEBASTIAN COUNTY, ARKANSAS, and Fort Smith River Development Corporation, et al., and Unknown Owners, Defendants.**

**No. 1725.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

June 17, 1964.

As Amended June 22, 1964.

Charles M. Conway, U. S. Atty., E. A. Riddle, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Thomas Harper, Fort Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

On May 1, 1963, the Government filed its complaint and declaration of taking to obtain:

"A perpetual and assignable right and easement to construct, operate, and maintain channel improvement works on, over and across Tract No. 111E–1, including the right to clear, cut, fell, remove and dispose of any and all timber, trees, underbrush, buildings, improvements and/or other obstructions therefrom; to excavate, dredge, cut away, and remove any or all of said land and to place thereon dredge or spoil material; and for such other purposes as may be required in connection with said work of improvement; reserving, however, to the owners, their heirs and assigns, all such rights and privileges as may be used without interfering with or abridging the right and easement herein acquired; subject, however to existing easements for public roads and highways, public utilities, railroads and pipelines."

The Government also sought to obtain a temporary and assignable easement and right of way for a period of five years from the date of possession to construct, operate, or maintain a roadway over and across Tract No. 111E–2.

In the declaration of taking, filed contemporaneously with the complaint, the Secretary of the Army stated:

"The public uses for which said land is taken are as follows: The said land is necessary for use in connection with bank stabilization, channel rectification, control of

floods, and navigation on the Arkansas River in Sebastian County, Arkansas. The said land has been selected by me for acquisition by the United States for said project and for such other uses as may be authorized by Congress or by Executive Order."

Upon the filing of the declaration of taking, estimated just compensation was deposited in the registry of the court, and the court on the same day, May 1, 1963, entered an order requiring all persons in possession or control of the property to surrender possession of the same "to the extent of the estate being condemned." The property was owned by the Fort Smith River Development Corporation, which was the successor in title to certain individuals not necessary to enumerate here. The Government demanded a jury trial on the issue of just compensation, but on April 22, 1964, the date fixed for trial to determine just compensation, the Government, appearing by the United States Attorney, Charles M. Conway, and his assistant, E. A. Riddle, withdrew in open court the request for a trial to a jury, and by agreement of all parties the cause proceeded to trial to the court. At the conclusion of the evidence introduced by the parties, the cause was submitted and taken under advisement by the court, and the parties were directed to submit briefs in support of their respective contentions. The briefs have been received and considered, along with all the evidence, including the various exhibits introduced by the parties, and the question is now ready for determination and adjudication.

The land involved is known as Morris Island. The total acreage of the island at the time of filing the complaint and the declaration of taking was 160.50 acres. The perpetual easement area acquired is 97.35 acres, designated as Tract 111E–1, leaving a remainder of 63.15 acres, on which a five-year temporary easement for a roadway of 0.79 acre was impressed, designated as Tract 111E–2, so that the actual remainder at the time of taking was 62.36 acres.

Morris Island is a strip of land lying adjacent to the right bank of the Arkansas River. The river at that point runs approximately north, and is spanned by U. S. Highway 64 bridge near the south end of the island, and by a Missouri Pacific Railroad bridge located a short distance south and upstream from the highway bridge. The island varies in width east and west, and is approximately 1½ miles long north and south. It is situate in the Fort Smith city limits and in an Industrial (I 3) Zone. The island is adjacent to and riverward of a levee or seawall extending downstream from the U. S. Highway 64 bridge. The east boundary of the island is a slough or shallow waterway, which enters the river near the south end of the island. Access to the island is over a public road which crosses the slough on a causeway or low-water bridge.

The general work of bank stabilization, channel rectification, control of floods, and for the improvement of navigation on the Arkansas River from where it flows into the Mississippi River to near Tulsa, Oklahoma, is divided in sections, or projects. Morris Island is situated in the Shoofly Bend Cut-Off Project, which extends from river mile 361.9 to 356.4.

At the trial the parties agreed that the date of taking was March 26, 1962, although it will be noted that the complaint and declaration of taking were not filed until May 1, 1963. Prior to the actual entry by the Government upon the land, a right of entry was executed by the defendant landowners on January 17, 1962, but the court was not advised of the provisions thereof.

Prior to the beginning of the project, Tip Island had formed in the channel of the river west of Morris Island. On February 8, 1963, the Government filed a condemnation proceeding, Civil Action No. 1699, to obtain a perpetual easement to construct, operate and maintain channel improvement works on Tip Island. The ownership of Tip Island was in dispute, and when the condemnation suit was filed by the Government, various claimants filed answers claiming to be the

owners. Among the claimants were the defendants in the instant case, the then owners of Morris Island. After a full hearing, the court resolved the question of ownership, and in an opinion filed on January 2, 1964 (not published), the court said:

"The court is of the opinion that Tip Island originally emerged from approximately the middle of the river, and as the current moved against the island, it began forming sand bars on the lower or north end of it, which sand bars gradually increased in size, and this made it necessary for the U. S. Army Engineer Corps in 1962 to rectify the channel. This was done by the construction of the spur dikes, and since the river was caving badly on the west or Oklahoma side, they constructed the dikes from the Oklahoma bank to Tip Island and the sand bars formed by it. No doubt this did tend to divert the current more or less to the east side of Tip Island, because the same Exhibit, Y-1, which shows the spur dikes also shows that the U. S. Army Engineer Corps constructed a revetment extending on the Arkansas side and along the west bank of Morris Island from the Missouri Pacific bridge south of the island to a distance north of the island, so that there is no doubt that in a few years the main channel of the river will be between Tip Island and Morris Island, but Tip Island was not formed by accretions from Morris Island nor by reliction. Often the terms 'accretion' and 'reliction' are used interchangeably, and the law relating to accretions applies in all its features to relictions, but there was no reliction, that is, there was no recession of the current from the west side of Morris Island, which resulted in connecting Tip Island to Morris Island."

The above finding in Civil No. 1699 has been set forth to illustrate the extent of the work that the Government under-took in the section of the project in which Morris Island is situated. Prior to March 26, 1962, when the Government asked the owners of Morris Island for permission to enter thereon, it appears that the plans for the work in the section described as the Shoofly Bend Cut-Off Project had not crystalized, except to the extent that the Corps of Engineers desired to remove islands and other obstructions to navigation in the section. When possession of Tract 111E–1 was obtained, the Government proceeded to cut a trench 8,400 feet long through the tract from the south to the north end, of such depth and width as to enable it to construct a rock revetment, in an effort to stabilize the right or east bank of the river when it had succeeded in diverting the main current of the river from the west or left bank of the river. The trench that was cut through Tract 111E–1 left 36.86 acres of the easement area riverward of the trench and between the revetment and the then east or right bank of the river. This area of 36.86 acres was deliberately left to the ravages of the current, which, it was hoped, would remove the 36.86 acres and further aid in establishing the east or right bank at the line of the revetment.

After casting into the river the 36.86 acres of Tract 111E–1, there was left approximately 60.49 acres of the easement area, which, of course, included the area upon which the revetment was built. The testimony did not definitely establish the distance of the taking line of the easement east of the revetment, but one witness, a Government employee, said that the line was between 250 and 300 feet east of the revetment. Immediately east of the east-taking line of Tract 111E–1 is the remainder of approximately 62.36 acres left to the defendants and not within the area of either of the easement tracts.

At the trial the landowners introduced one witness on the question of just compensation, James F. Taylor, of Fort Smith, Arkansas, whom the court believes to be fully qualified and competent as an expert on the question of the value

of land in and near the City of Fort Smith, Arkansas. The Government introduced one witness on the same question, Mr. Bernard W. Klein, a reviewing appraiser, who has had many years experience as a Government appraiser of land in condemnation projects in various parts of Arkansas. The two witnesses did not agree as to the market value of the land upon which easements were imposed and damages to the remainder of 62.36 acres. At page 3 of defendants' memorandum brief in chief, they make the following statement:

> "Defendants contend that Taylor was correct in his appraisal in assuming for all practical purposes that the land described in the easement was, by the very nature of the easement, forever taken from the owners, and that they could never put the same to its highest and best use because of the restrictive and drastic nature of the easement, giving, as it does, to the United States the right at any time hereafter to do anything it may choose upon the property within the easement, even to the point of completely excavating it or cutting it away or removing all or any part of it, or placing thereon any dredge or spoil material. It may well be that the United States will never exercise all of the rights acquired in the easement, but that they will not do so is a matter purely of conjecture because the right to do so will continue to exist perpetually. This was reluctantly admitted by the witness Shelton, Chief of the River Development Section for the Corps of Engineers, and by the witness Klein, appraiser for the Corps of Engineers."

In its brief, the Government undertakes to analyze the testimony of the witness Taylor, and argues that his testimony does not form a sufficient base for evaluating or determining just compensation. Following the discussion of the testimony, the Government contends that the statute, 33 U.S.C. § 595, applies, and that in awarding just compensation or assessing the damages, the court shall take into consideration, by way of reducing the amount of compensation or damages, any special and direct benefits to the remainder arising from the improvement. It thus argues that the remainder of the defendants' land has received special benefits which reduce the just compensation to a sum not in excess of $7,500.

In the reply brief of the landowners, the learned attorney for the landowners at page 1 stated:

> "Apart from an effort to ridicule the witness Taylor and to belittle his credibility, the plaintiff's brief would appear to narrow the issues down to the following:
>
> "1. That the easement described in the complaint and declaration of taking does not mean what it says and leaves the underlying fee owners free to treat with the property in question as though the easement were never imposed; and
>
> "2. That being so, the landowners derive special benefits by reason of the improvement of the Arkansas River, thus enhancing the remainder of their property not taken to such an extent that they have sustained no damage by reason of the taking of any."

█ Without doubt, the just compensation required to be paid for private property taken for public use means the full and perfect equivalent in money of the property taken; that the owner should be put in as good position pecuniarily as he would have occupied if it had not been taken. In United States v. Miller (1943), 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, the court, beginning at the bottom of page 373 of 317 U.S., at page 280 of 63 S.Ct. said:

> "It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard,

the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value,' the 'market value,' and the 'fair market value' of what is taken. The term 'fair' hardly adds anything to the phrase 'market value,' which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given,' or, more concisely, 'market value fairly determined.'"

Following the above statement, the court discussed the elements which should be considered in determining the market value, and held that the "special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value."

The chief contention of the Government is that the remainder of the property, 62.36 acres, has received special benefits and that such special and direct benefits to the remainder arising from the improvement should be taken into consideration in fixing the award for the part taken.

Title 33 U.S.C. § 595, provides:

"In all cases where private property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, where a part only of any such parcel, lot, or tract of land shall be taken, the jury or other tribunal awarding the just compensation or assessing the damages to the owner, whether for the value of the part taken or for any injury to the part not taken, shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from the improvement, and shall render their award or verdict accordingly."

In United States v. Miller, supra, the court at page 375 of 317 U.S., at page 281 of 63 S.Ct., following its discussion of the elements to be considered in determining market value, said:

"Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands? If so, were the lands in question so situate as to entitle respondents to the benefit of this increment?"

In answering the two questions, the court said, beginning at page 376 of 317 U.S., at page 281 of 63 S.Ct.:

"If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any in-

crease in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities."

■ The extent of the special benefit, if any, to the tracts involved herein by the project to improve navigation on the Arkansas River is a fact question and must be determined from all the evidence.

It appeared from the testimony that because of the manner of construction of the U. S. Highway 64 bridge and the Missouri Pacific Railroad bridge, situated immediately south of the highway bridge, when considered in connection with the location of a huge rock bluff several miles north down the river, that it was necessary to divert the current of the river from the left or west bank to the right or east bank, and therefore the instant suit, along with some other suits, was filed to remove all obstacles from the current when it was forced from the west or left bank to the east or right bank.

The record does not disclose that any other condemnation suits were pending, or the extent of the work, if any, that was underway on March 26, 1962, when the Government entered upon the land involved herein.

Government's Exhibit No. 1, entitled "Disposition Form," consists of certain inter-office memoranda between the Deputy District Engineer, the Acting Division Engineer, and the Deputy Division Engineer of the U. S. Army Engineer District, Little Rock, Arkansas. In the document, Captain E. T. Williams, Deputy District Engineer, stated:

"4. Due to the accelerated program on the Arkansas River, sufficient time is not always available to accomplish acquisition prior to initiation of construction. Heretofore right-of-entry for construction, ENG Form 2803, has been obtained in a great many cases so that channel improvement construction would not be delayed. Subsequently difficulty has been encountered in the acquisition of a vested interest in real estate after construction work is initiated. In order to minimize these difficulties the inclosed right-of-entry, which does not evolve into acquisition of land as a mandatory condition, is being used in connection with bank stabilization and channel rectification in this District. It is the opinion of this office that the use of the right-of-entry for the subject project will not delay the construction and will be instrumental in considerable savings in land payment considerations for bank stabilization and channel rectification work."

Attached to the document are two maps, one designated as "River and Harbor Project, Arkansas River and Tributaries, Bank Stabilization and Channel Rectification." The other bears the same title except that outlined thereon is the Shoofly Bend Cutoff Project.

There was no evidence introduced by either party which indicated whether the public and the landowners in general knew or had any information as to the extent of the Arkansas River Navigation and Bank Rectification Project. The only information contained in the instant record is that the Army Engineers on January 17, 1962, obtained permission from the landowners to enter upon Morris Island, but did not, in fact, enter upon any part of the island until March 26, 1962, and the parties have agreed, as heretofore stated, that the date of the taking of the property is March 26, 1962.

The Government vigorously contends that the remainder received special and direct benefits and that, under the rule announced in United States v. Miller, supra, the award should be reduced by the amount of special benefits.

In United States v. River Rouge Improvement Co. (1926), 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339, the court on page

416 of 269 U.S., on page 146 of 46 S.Ct. said:

" 'The kind of benefit, which is not allowed to be estimated for the purpose of such deduction, is that which comes from sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof * * *.' "

In United States v. 2,477.79 Acres of Land, etc. (5 Cir. 1958), 259 F.2d 23, the court, beginning on page 27, stated:

"Tracts B–113–1 and B–113–2 were taken for a flood control project. The compensation payable for these tracts should not include any increase or enhancement of value which results from the project for which they were taken. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, rehearing denied 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162; United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240; Id., 350 U.S. 956, 76 S.Ct. 346, 100 L.Ed. 832, rehearing denied 350 U.S. 1009, 76 S.Ct. 648, 100 L.Ed. 871. This rule is recognized by Bowles and he makes no claim that the compensation for the two reservoir tracts should be measured otherwise than by its value for farming and ranching purposes. The Congress has provided that in takings such as that here involved, where only a part of a parcel of land is taken, special and direct benefits to the remainder arising from the improvement shall be taken into consideration in fixing the award for the part taken. 33 U.S.C.A. § 595. The three tracts involved in this proceeding were, prior to the taking, and should be regarded, for the purpose of fixing compensation for Tracts B–113–1 and B–113–2, as a single parcel. United States v. Miller, supra. The reduction or offset is only with respect to special benefits accruing to the remaining land

and no deduction will be made for general benefits. Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L. Ed. 270; McCoy v. Union Elevated Railroad Co., 247 U.S. 354, 38 S.Ct. 504, 62 L.Ed. 1156; United States v. River Rouge Improvement Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339; United States v. Alcorn, 9 Cir., 1935, 80 F.2d 487. No disagreement exists between the parties as to the correctness of this rule but there is a wide difference between them as to how it applies to the particular facts of this case.

"General and special benefits have been thus distinguished:

" 'The most satisfactory distinction between general and special benefits is that general benefits are those which arise from the fulfillment of the public object which justified the taking, and special benefits are those which arise from the peculiar relation of the land in question to the public improvement. Ordinarily the foregoing test is a satisfactory one, though sometimes difficult to apply. In other words, the general benefits are those which result from the enjoyment of the facilities provided by the new public work and from the increased general prosperity resulting from such enjoyment. The special benefits are ordinarily merely incidental and may result from physical changes in the land, from proximity to a desirable object, or in various other ways.' . 3 Nichols on Eminent Domain, 3d Ed., 45, § 8.6203.

"It has been held that special benefits are to be differentiated from general benefits where the differences are in kind and not in degree. United States v. Alcorn, supra. It is urged on behalf of Bowles that the reservoir project enhanced values in the entire area, not only of the lands immediately adjacent to the reservoir but in varying degrees to land substantially removed. In

the Alcorn case the project was the construction of the Bonneville Dam on the Columbia River. The property of the landowner Alcorn was distant about a quarter mile from the reservoir. A portion of his land was acquired as a right-of-way for railroad trackage that had to be moved from the reservoir site. The construction of the dam and reservoir increased the values of Alcorn's land from a nominal figure to amounts appraised at varying figures up to $25,000. Land values in the area of the Bonneville project had been greatly increased by it, with the precentage of enhancement diminishing as the distances from the project became greater. It was held that while the increase in value of Alcorn's property was different from that enjoyed by owners of property more remote from the project, the benefit to the land was not special or direct within the meaning of the statute. The rule announced in the Alcorn case has not been universally applied. See the annotation in 145 A.L.R. 7. We think that special benefits are those which are direct and peculiar to the particular property as distinguished from the incidental benefits enjoyed to a greater or less extent by the lands in the area of the improvement. A special benefit is nonetheless such because other lands in like situations are similarly benefited."

United States v. Alcorn (9 Cir. 1935), 80 F.2d 487, is a case wherein the Government condemned 8.96 acres for a railroad right of way, when its former tracks were to be flooded by the waters impounded by the Bonneville Dam across the Columbia River. At page 488 the court said:

"The defendants' property at once increased in value from a nominal figure of not to exceed $100 per acre to a speculative value variously estimated at $11,729, $19,000, and $25,-000, with damages to the four acres not taken estimated at $2,400, and $6,000 by the defendants' witnesses and at $1,500, $800 and $1,795 with damages to the balance estimated at $400 and $120 by the government's witnesses. The jury fixed the amount of recovery at $5,750 without segregating the amount for the land taken from the amount awarded as damages to the land retained by the defendants. The government contends that the increase in value of the property due to the announcement of the Bonneville project should be deducted from the amount of the award, and that the rulings and instructions of the court to the jury, and the rejection of the government's evidence and instructions on that subject were erroneous. It was conceded at the trial that the value of the property on October 2, 1934, plus the amount of damages to the land not taken was the amount to which the defendants were entitled subject to a deduction of any special and direct benefits to the remainder arising from the improvement. 33 U.S.C.A. § 595. It was held by the trial court that the improvement in question was the whole Bonneville project, and not merely the railroad for which the property of defendants was to be taken. This ruling is not questioned. Hence the question presented for our consideration is whether or not the addition to the market value of the property by reason of its speculative value arising from its proximity to so great a project is a 'special and direct benefit' within the meaning of 33 U.S. C.A. § 595."

At page 489 the court said:

"We are satisfied that the increase of value to the defendants' property due to its proximity to the great project, while different from that enjoyed by owners of more remote land, is not a special or direct benefit to the land not taken within the meaning of the applicable statute

fixing the measure of just compensation to be awarded for land taken by condemnation by the government of the United States for river and harbor improvements. 33 U.S.C.A. § 595, supra. The government points out no special benefit to the remaining four acres and offered no proof upon it, hence, we content ourselves with a reference to the decision of the Supreme Court in U. S. v. River Rouge Imp. Co., 269 U.S. 411, 415, 46 S.Ct. 144, 70 L.Ed. 339, in which the difference between general and special benefits from a public improvement is pointed out."

The case of Board of Levee Inspectors of Chicot County v. Crittenden (8 Cir. 1899), 94 F. 613, arose in Arkansas. The court at page 617 said:

"It is assigned for error that the board was not permitted to show the benefits which accrued to the land of the plaintiffs in consequence of the acts complained of. But it is well settled that mere general or public benefits, or such benefits as result to the public at large,—as, for illustration in this case, to the other lands within this levee district,—cannot be charged to the owner of the land which is taken for the public use. 'In estimating either the injuries or benefits,' says Judge Cooley, 'those which the owner sustains or receives in common with the community generally, and which are not peculiar to him, and connected with his ownership, use, and enjoyment of a particular parcel of land, should be altogether excluded.' Cooley, Const. Lim. § 698; Chiles [Childs] v. New Haven & N. Co., 133 Mass. 253; Sullivan v. [North Hudson County] Railroad Co., 51 N.J.Law, 518, 18 Atl. 689; [Natchez, Jackson & Columbus] Railroad Co. v. Currie, 62 Miss. 506."

Footnotes [1, 2, 3].

1. The map shows the extent of the over-all project.

Sites of proposed locks and dams on 450-mile segment of River.

**2.** Copy of an article prepared by Bill Simmons of the Associated Press, which appeared in the Sunday, June 14, 1964, edition of the Arkansas Gazette.

# Taming the Arkansas: It's 20-year, $1.2 Billion Job

By BILL SIMMONS
Of the Associated Press

The Arkansas River rises in the Rocky Mountains of Colorado and flows southeastward—a series of elbow and U-turns stretching 1,459 miles to the Mississippi River.

In Colorado it is a quick, clear stream with foam-flecked rapids. It is calmer in Kansas and Oklahoma; in Arkansas, it is slow, meandering and muddy.

Snag-riddled and sand bar-crusted along its southernmost 400 miles, it is the third longest river in the United States. It has been impotent since the steamboat era.

The Arkansas is all that a river should not be.

Its high silt content, industrial and municipal pollution, snags, sand bars, ill-defined channel and great seasonal fluctuations in the water level prevent the Arkansas from being a fishing stream, a reliable route for river commerce, a source of hydroelectric power or a source of safe, clean recreation.

But all that is changing.

The changes will cost the United States $1.2 billion, which is more than was spent on the St. Lawrence Seaway and almost four times the cost of building the Panama Canal.

### Began 20 Years Ago

The sow's-ear-to-silk-purse assignment went to Army Engineers almost 20 years ago. The job is one-third finished and is scheduled to be completed in 1970.

Engineers were told to make the lower 452-miles segment of the River navigable. The task rates as among the most monumental in the history of the Engineers.

The cost of the program, the materials necessary to complete it and the projected benefits compose astronomical statistics. The project has been rated both as highly necessary and as pure pork barrel.

The River has a history of being extraordinarily useless.

Steamboats and keel boats plied the Arkansas between 1824 and 1880 despite snags and underwater obstacles that resulted in hundreds of sinkings. The completion of railroad lines in 1871 and 1872 began to draw traffic from the River, and steamboat travel began a slow death.

*"There is rising every day, I believe, a New South * * * seen in your universities and cities and industries. Numerous dams and reservoirs throughout the White River and Arkansas River basins in a sense symbolize the New South. For they mean navigation for your commerce, protection for your cities, power for your industries, recreation for your families."*
—*President John F. Kennedy, Little Rock, October 3, 1963.*

### Sometimes a Sewer

More recently the River has served as a sewer for most of the cities, hamlets and industries on its banks. Wastes were deposited in the River in huge amounts. Programs are being considered, planned or implemented in about 30 cities to eliminate the pollution and develop new plants to dispose of wastes. The cost of these projects is about $30 million.

Occasionally — in extremely dry periods—the River has been used for drinking water, but even heavy and concentrated filtration fail to eliminate the distinctive River taste from the water.

Several groups in cities along the River decided that the Arkansas' potential was not being fulfilled.

Foremost among these groups was one headed by Newt Graham of Tulsa. Graham's group urged and got Army Engineers to study the river and its possibilities, and on September 20, 1945, the Engineers recommended a multiple purpose plan for the river.

Graham led a six-man delegation to Washington in 1946 and made a presentation to Congress about the unrealized value of the Arkansas. With him, among others, were the late David D. Terry of Little Rock, former United States representative, Reese Caudle of Russellville and Clarence F. Byrns of Fort Smith.

### Some Powerful Help

They convinced Congress with help from several powerful congressmen and Graham was dubbed father of the Arkansas River project, which was approved by Congress in the River and Harbor Act passed July 24, 1946.

The late Senator Robert S. Kerr (Dem., Okla.) led the floor fights to get appropriations for the project each year. With his death, Senator John L. McClellan became project leader in Congress.

Prior to the approval of the plan sought by Graham, the Arkansas had been left to deteriorate. From 1832 to 1902, Congress authorized snagging, dredging and construction projects to improve navigation on the River. After 1902, only snagging operations were approved, and they were suspended in 1943.

Now, more than 20 years later, Army Engineers are busy trying to stabilize the River route and develop a channel nine feet deep and 150 feet wide in its narrowest passes.

The project reached from Catoosa, Okla., 13 miles east of Tulsa, to the Mississippi River. The Arkansas will be channelled to the Mississippi via a 10-mile canal 300 feet wide reaching from Arkansas Post southeastward. The route proceeds upriver with the Arkansas from Arkansas Post to the river junction with the Verdigris River in Oklahoma. On the Arkansas the channel will be 250 feet wide, and on the 52-mile Verdigris segment, which turns northward at Muskogee, the route will be 150 feet wide.

The project would provide a waterway joining Arkansas and Oklahoma with the Missouri, Illinois, Ohio, and Mississippi Rivers and the Great Lakes. It would mark the development of the biggest unproductive piece in the puzzle formed by the Mississippi River tributary network.

To do this, 18 locks and dams must be built a ta cost of $660 million—half the estimated total cost—with 12 to be built in Arkansas for $342 million. The River at Catoosa would be about 400 feet higher mean sea level than it is at Arkansas Post.

Dam construction requires the movement of 75 million cubic yards of earth and stone, the installation of 430 million pounds of steel, 7.5 million tons of other materials, plus 4.7 million barrels of cement.

### 70 Pct. Complete

Bank stabilization work is almost 70 per cent complete but the remainder of this portion of the work requires 245,000 squares of lumber (a square is 10 feet by 10 feet), 1.6 million tons of stone.

Contracts let to date have gone to firms in Arkansas, California, Illinois, Iowa, Kansas, Kentucky, Minnesota, Mississippi, Missouri, Nebraska, Oklahoma, Tennessee and Texas. More than 3,000 men are working in the field on the project.

The scheduled completion date was jolted when appropriations for fiscal 1964 failed to get congressional approval until last January.

Army Engineers say they can handle and need $15 million more than allotted in President Johnson's budget for fiscal 1965 to keep the project on schedule. Congress has not yet taken up the budget, though, and there is some chance that the requested funds will be restored.

Construction on the river projects is expected to result in about $25 million for labor and salaries in Arkansas and Oklahoma this year.

Other not easily measured benefits expected to be derived from the program include flood control, new and expanded recreation facilities, and the incentive to control river pollution.

Seven hydroelectric power plants will be built at various dams with an initial capacity of 573,000 kilowatts and an ultimate capacity of 791,900 kilowatts.

The Arkansas would provide a new transportation route for heavy deposits of oil, gypsum, uranium, limestone, dolomite, granite, glass sand, iron, clay, ligdinite, shale, sandstone, silver, slate chalk, salt, and bauxite in Arkansas and Oklahoma.

Engineers estimate that 13.2 million tons of goods will be shipped on the Arkansas annually when the job is done.

Cities on the River had been handed a new and intriguing sales pitch for attracting industry.

Chambers of commerce, city officials, county development groups and businessmen are almost unanimous in their support of the project. Most of them agree with a statement in the 1961 edition of "Waterways of the United States," published by the National Association of River and Harbor contractors. That statement says the "Arkansas, White, and Red Rivers are the sleeping giants of the Mississippi River tributary network. When awakened * * * their strength will make itself felt in manifold benefits."

**3.** A news item which appeared in the Southwest American of Fort Smith, Arkansas, in its June 12, 1964, edition.

Arkansas River apppropriations included:

Banks stabilization: $15 million.

Navigation locks and dams: $47 million.

Dardanelle Lock and Dam: $10 million.

Ozark Dam: $1 million.

Eufaula Dam: $3 million.

Keystone Dam: $6 million.

Kerr Dam: $6 million.

Webbers Falls Dam: $1 million.

984

■ Without doubt, the market value of all property lying within the corporate limits of Fort Smith, Arkansas, as well as adjacent property has greatly advanced in recent years. Like all other lands situated on or near the river and within the corporate limits of a thriving city, the market value of the land involved herein has increased. Even though the increase in the market value of the land involved may exceed in extent the increase in market value of lands more remotely situated, yet the benefit resulting from the over-all project is not a special or direct benefit to the remainder within the meaning of the applicable statute, heretofore referred to. The benefit, if any, to the remaining land is a general benefit and arises from the fulfillment of the public project above referred to, which justified the taking. No special or direct benefit arose from the relation of the land in question to the public improvement. It is the owner's loss not the taker's gain which is the measure of the value of the property taken.

Since the remainder of the land has not received any special or direct benefits, as distinguished from general benefits, the court must determine from the evidence the amount of compensation to be awarded to the landowner.

■ As heretofore stated, the landowners introduced one witness on the question of value and damage, James F. Taylor, of Fort Smith, Arkansas, whose experience as a realtor and knowledge of the value of land situated in the City of Fort Smith and adjacent thereto, eminently qualifies him as an expert on the question of market value.

The Government introduced one witness on the question of just compensation, Bernard W. Klein, staff appraiser for the Government. Mr. Klein has had several years experience as an appraiser of land situated in the various reservoir projects, such as Norfolk and Bull Shoals, that have been constructed in Arkansas, but in the opinion of the court his experience and knowledge of the market value of lands, such as the lands involved herein, are not comparable to that of Mr. Taylor. Both witnesses in their testimony referred to several sales of land they compared to the land involved herein. Such knowledge on the part of the witnesses may have aided them in arriving at the conclusions testified to by them, but the court is doubtful of the applicability of some of the so-called comparable sales because of the location of the land herein involved. Both witnesses agreed that the highest and best use for the land at the time of taking was for agricultural purposes. On July 15, 1957, the purchasers paid $12,500 for the land. They had owned it from that date to the date of taking, or a period of approximately 4½ years. In the meantime, the value had steadily increased.

In the opinion of Mr. Taylor, the value of the entire tract of 160.50 acres on the date of taking was $200 per acre, or $32,100. The same witness testified that the value of the remainder after taking was $6,250, but in arriving at the value of the remainder, he did not place any value on the acreage in the perpetual easement situate between the revetment and the remainder of 62.36 acres.

Of course, the 36.86 acres lying west of the revetment, and which the Government consigned to the ravages of the diverted current of the river, are a complete loss. Certainly the perpetual easement which the Government acquired imposes a servitude thereon. It was such an intrusion as to subtract substantially, if not wholly, from the former owners' enjoyment of the property.

Technically, there is reserved to the owners "such rights and privileges as

may be used without interfering with or abridging the right and easement acquired herein." For all practical purposes the rights of the Government acquired in the easement area are absolute, and such rights may be exercised at any time the U. S. Corps of Engineers desires or thinks necessary. Under the terms of the easement the interest of the defendants, or their assigns, in the easement area are so indefinite and so dependent upon the will of the agents of the Government as to have practically no value.

Mr. Klein valued the entire tract before taking at $12,000, and the remainder, after the imposition of the easement, was valued by him at $60,000. For agricultural purposes alone he valued the remainder and the easement area lying east of the revetment and west of the remainder at $7,500.

In the opinion of the court the market value of the entire tract on the date of taking was $200 per acre, or $32,100. The remainder of 62.36 acres after the taking, upon which no easement was imposed, had a value of $150 per acre, or $9,354. Also, the court believes that the rights reserved to the landowners in the easement area between the revetment and the remainder are of at least nominal value, which the court fixes at $1,500. Thus, the market value of the remainder, plus the value of the right in said easement area, amounts to $10,854, which, subtracted from the market value of the entire tract at the time of the taking, leaves $21,246, which the court finds from the evidence to be just compensation to the landowners for the interest taken and damages sustained.

Therefore, the United States Attorney will prepare and present, within a reasonable time, precedent for judgment for entry fixing just compensation for Tracts Nos. 111E–1 and 111E–2 in the sum of $21,246.

